## Fort Worth & Rio Grande Railway Company v. Mattie Kime et al.

### Decided May 26, 1899.

**1. Master and Servant—Warning Servant of Overhead Bridge.**

A statement by a yardmaster to a newly employed brakeman that a certain bridge was too low to clear a man standing on a low car, and to look out for it, and by the conductor and a brakeman of the train upon which he was employed that it would not clear a man on a high box car, is not such warning as will prevent a recovery from the railway company for the death of the brakeman, who came into collision with the bridge in the ordinary discharge of his duty, standing on a car of ordinary height, when no cords were suspended overhead to give warning of the bridge, as was the general custom of railroads having low bridges.

**2. Same—Railway Company—Negligence.**

A railroad company knowing that it had not constructed its roadbed under a certain bridge low enough to allow its brakeman to safely pass beneath it in the discharge of his duty, is guilty of negligence causing his death in not sufficiently warning him of that danger.

**3. Same—Risk Incident to Employment.**

A danger which is not obvious and of which the servant was ignorant when entering the employ of a railway company is not one assumed by him as incident to the employment.

**4. Damages for Causing Death—Verdict Not Excessive.**

A verdict for $15,000, although a less sum might have covered the pecuniary loss involved for causing the death of plaintiff's husband, an expert railroad man, 30 years old, in good health, with a life expectancy of thirty-five years, and presumptively with the usual prospects of promotion, earning about $75 per month, of which at least $45 went to the support of his wife and two young children, will not be held excessive, when he was industrious and thrifty and provided a comfortable home for his family, although no proof was offered of the wife's life expectancy, nor of what sum would suffice to purchase the equivalent of the pecuniary benefit which the widow and children might reasonably have expected from his life.

Appeal from Parker. Tried below before Hon. J. W. Patterson.

*Newton H. Lassiter*, for appellant.

*J. H. Barwise, Jr., H. W. Kuteman,* and *J. T. Montgomery,* for appellees.

STEPHENS, Associate Justice.—February 6, 1897, H. J. Kime entered appellant's service as head brakeman on a freight train, and was killed a few hours afterwards, as the train started on its first regular trip to Brownwood, at or near Hill Street bridge, in the city of Fort Worth, which is about a quarter of a mile west but in sight of appellant's roundhouse, from which the train started. He left a widow and two small children, who sued appellant on account of the loss so sustained, and recovered damages in the sum of $15,000, from which judgment this appeal is prosecuted.

The errors assigned are numerous, but the real questions at issue are few, involving mainly the sufficiency of the evidence to sustain the verdict, and the amount thereof.

It is contended that the evidence failed to show, as alleged, that H. J. Kime was struck and killed by the overhead Hill Street bridge, but while no witness saw the collision, the evidence warranted the finding that the bridge was low enough to strike the head of deceased, and the circumstances negatived the existence of any other cause of death.

It is further and strenuously insisted that if the low bridge caused the fatal collision, it was one of the risks assumed by deceased when he entered the service, and especially in view of the warning given him of this danger, particularly by the yardmaster that morning; and this we think is the most difficult question in the case.

The testimony of the yardmaster on this point was briefly this: "Mr. Kime met me about 5 o'clock, February 6, 1897, and we walked together to the Fort Worth & Rio Grande yards. We talked in regard to the road on our way over, and I told him and located the iron bridges on the line of road, and told him they would not clear a man standing on a high car, and to look out for them. I also called his attention to the Hill Street bridge; told him it would not clear a man standing on a low car, and to look out for it; that the bridge was just at the west end of the yard limits."

The conductor of the train upon which deceased was brakeman, however, testified that he notified deceased that the bridge in question "would not clear a man on a high box car," but according to his testimony it would clear a man on a low or ordinary car, and he evidently so believed when he warned deceased. To the same effect was the testimony of Brakeman McGehee.

Early that morning, and while it was yet dark, deceased had made a trip with this conductor and brakeman to Belt Junction, four miles out, on a train of empty stable cars, returning upon the pilot of the engine. McGehee thus states what passed between himself and deceased on this trip: "As we were pulling out for Belt Junction Mr. Kime climbed on top of the train about two car lengths behind the engine. I climbed up also about five car lengths from the engine and waited until Mr. Kime came to me. I noticed while on top that he was coming toward the rear end, and we met. I told Mr. Kime that there was a low bridge about two blocks west of where we were, and that it would hit a man on a high car, and to look out for it. Mr. Kime thanked me, and says: 'You say about two miles?' I replied, 'No,' and told him it was about two blocks."

The inquiry so made by deceased, it will be noted, at least tended to rebut the testimony of the yardmaster. It also appears that his testimony was in conflict with that of the conductor as to the height of this and other bridges on the road.

The evidence tended to show that deceased was standing on a car of ordinary height, and not on a high car, when he was killed; that he was a prudent and skillful brakeman of long experience, and that he must have been ignorant of the danger to which he was exposed. It does not appear that it was the duty of the yardmaster any more than

of the conductor or brakeman to warn the deceased. The superintendent of transportation, who employed him, was not offered as a witness, which warranted the inference that he gave no warning. No warning was given of the near approach of a dangerous overhead bridge by means of suspended cords, as was the general custom of railroads having low bridges.

Under these circumstances, we are of opinion that the jury were not required to accept as an uncontroverted fact the statement of the yard-master that he warned deceased of the danger of passing under the bridge in question on an ordinary car as well as on a high car, or at least that they were not required to find that deceased had been adequately warned of the danger which resulted in his death.

We overrule without hesitation the contention that the deceased is held in law to have absolutely assumed the risk of his life in passing under a low bridge, and hence that appellant was not liable for a failure to warn him of such impending danger. See Elliott on Railroads, volume 3, section 1271, where this question is discussed and the conflicting authorities are cited.

We conclude, therefore, that the evidence not only raised the issues but warranted the jury in finding, first, that appellant, knowing that it had not constructed its roadbed under Hill Street bridge low enough to allow its head brakeman to safely pass beneath it in the discharge of his duty, was guilty of negligence causing his death in not sufficiently warning him of the impending danger; second, that being ignorant of the danger, and it not being obvious, he did not assume the risk involved; third, that he took such care for his own safety under all the circumstances as a person of ordinary prudence would have done.

If there was error in submitting any of these issues to the jury, either in giving or refusing charges, it is not available to appellant under any of the propositions submitted in its brief, as will readily appear from the propositions themselves read in connection with the entire charge, in the light of the foregoing conclusions of fact.

The objections to the admission and exclusion of evidence, and to the argument of counsel, are likewise untenable, as will readily appear from an examination of the bills of exception set out in appellant's brief to support the objections made.

The remaining question is that of the alleged excess in the verdict, and but for the precedents found in our Supreme Court Reports, we would be inclined to sustain this assignment and require a remittitur. The deceased was an expert railroad man, 30 years old, and in good health, with a life expectancy of thirty-five years, and presumptively with the usual prospects of promotion, earning regularly about $75 per month, of which at least $45 went to the support of his wife and his two infants, one and two years old. He seems to have been industrious and provided well for his family, evincing some measure of thrift, in that he had already provided a comfortable home. No proof was offered of

the wife's age or expectancy, nor was any effort made to show what· sum of money would be sufficient to purchase in any form the equivalent of the pecuniary benefit which the widow and children might natur- ally and reasonably have expected to receive had the deceased lived.

In this state of the record, while it seems to us that a less sum than $15,000 might have covered the pecuniary loss involved, we are con- strained to overrule the assignment complaining that the verdict is ex- cessive, since in respect to the extent of the loss and the amount of the verdict we are unable to distinguish this case from the following death- loss cases: Railway v. Smith, 65 Texas, 167; Railway v. Ormond, 64 Texas, 485; Railway v. Lehmberg, 75 Texas, 61. In the first cited a verdict for $15,000 was approved; in the second, $12,000, and in the third, $10,000.

The judgment must therefore be affirmed.

*Affirmed.*